UNITED STATES of America, Plaintiff,

v.

CAMP COAL COMPANY, INC., Defendant.

No. 85–AR–2117–S.

United States District Court, N.D. Alabama, S.D.

Feb. 20, 1986.

---

3. *See* CAL.BUS. & PROF.CODE §§ 9023, 9024 (Deering 1985).

Frank W. Donaldson, U.S. Atty., Sharon D. Simmons, Asst. U.S. Atty., B. Catherine Freels, Sp. Asst. U.S. Atty., U.S. Dept. of the Interior, Knoxville, Tenn., for plaintiff.

Charles A. Powell, III, Birmingham, Ala., for defendant.

## MEMORANDUM OPINION

ACKER, District Judge.

The above entitled action was tried on January 20, 1986. Plaintiff, the United States, offered no witnesses in its case-in-chief, relying entirely on documentary evidence to make out its prima facie case. At the conclusion of the plaintiff's case, the court took under advisement the motion of defendant under Rule 41(b), F.R.Civ.P., and called upon defendant, Camp Coal Company, to proceed. Camp Coal offered several witnesses in support of its defenses, and the United States then offered several rebuttal witnesses. Based on the evidence, the court makes the following findings of the facts pertinent to its decision.

### FINDINGS OF FACT

The Alabama Surface Mining Commission (ASMC) issued to Camp Coal a valid permit to perform the surface mining of coal at a site in Blount County, Alabama. Because Alabama had previously applied for and obtained "primacy" in the promulgation and enforcement of surface mining regulations within its borders, ASMC operates pursuant to Public Law 9587 as the agency with primary responsibility for regulating surface mine operators in Alabama. The Office of Surface Mining of the Department of Interior (OSM) therefore has no direct enforcement function in Alabama, but rather performs an "oversight" function.

As the result of an inspection by OSM of Camp Coal's site, OSM on May 20, 1983, issued a ten day notice to ASMC asserting that OSM had found two violations at the site, namely: (1) the breach of a diversion ditch, and (2) rills and gullies in backfilled and graded reclamation areas. OSM admits that Camp Coal timely corrected violation number 1. Only the second of the

alleged violations is the subject of this litigation. OSM's inspector made no finding of imminent danger to the environment or to persons as a consequence of the "rills and gullies" found to exist.

After receiving the ten day notice ASMC conducted its own inspection of the site and responded to OSM stating that ASMC's position was that the filling of the rills and gullies was not yet due to be completed. This response dated May 31, 1983, stated, *inter alia*:

> Inspector Pridmore inspected the mine on May 24, 1983, and observed that the miner had planted sericea lespedeza and fescue earlier in the spring of 1983. The grass and sericea lespedeza are small at the present time but the plants are visible. The coal company had smoothed the gullies before planting. The heavy rainfall that was [sic] recently occurred has formed some gullies more than 9″ deep. Inspector Pridmore's opinion is that the new seeding should be allowed to develop a root system before shaping an [sic] mulching the gullies. The gullies should not be shaped before the fall of 1983 or the spring of 1984. W.J. Berry, ASMC inspector concurs with this recommendation.
>
> The permits involved in repermitting of P–1685 includes P–2094, A–514, P–2408 and P–2713. Permit # P–2713 expired on 8/11/82 and encapsulated all permits with 30 acres eligible for mining. The 8 month period extended the permit to January 20, 1983 with July 1983 being the violation date for untimely reclamation. Therefore, back filling and grading violations could not occur until after July 20, 1983 due to ASMC regulations. (See memo from John T. Davis OSM dated Nov. 19, 1983 addressed to Ronald Reeves).
>
> We feel these actions should appropriately resolve this complaint. If there are questions or need for further discussion of this matter please contact me.
>
> > Sincerely yours,
> > Alan H. Goode,
> > Assistant Director.

On July 8, 1983, OSM sent Camp Coal a notice of violation. On July 27, 1983, OSM notified ASMC that its response was "inadequate". OSM's inspector had been Robert McPheeters. Camp Coal tried unsuccessfully to discuss the situation with McPheeters. McPheeters had been transferred by OSM and never returned Camp Coal's telephone calls. Meanwhile, Camp Coal was following the ASMC guidelines and suggestions as to the rills and gullies. Being unhappy with the responses by ASMC and Camp Coal, OSM demanded abatement of the alleged violation on or before October 6, 1983. OSM conducted no inspection whatsoever between the issuance of its notice of violation and the abatement date of October 6, 1983. Its first inspection after the notice of violation was conducted on October 19, 1983, when a cessation order was issued. The inspection was conducted by an inspector who had never seen the minesite before. He found by a faulty process of deduction that there had been no abatement. In truth and in fact Camp Coal had refilled the rills and gullies after the cessation order was issued, and before October 6, 1983, even though not required by ASMC. Intervening rains after October 6 had recreated new rills and gullies. These were not the same rills and gullies which had been observed by McPheeters or by ASMC and mentioned in its response of May 31, 1983.

On December 16, 1983, David Dykes, a reclamation inspector with OSM, wrote to Camp Coal, affirming the cessation order and stating the following reason:

> Due to the fact the company failed to notify OSM upon the abatement of the NOV [notice of violation] and the violation reappeared prior to the follow-up inspection, the violation must be considered as continuing.

In other words, OSM found as a fact that Camp Coal had timely completed the abatement but had failed to notify OSM, thus rendering the abatement itself meaningless.

Pursuant to the findings of ASMC, Camp Coal completed backfilling the new rills and

gullies and reseeded in the spring of 1984. As a result of this action an enforcement action which had been filed by the United States in *USA v. Camp Coal Co.*, CV 84–P–0955–S (of which this court takes judicial notice), was dismissed.

Unfortunately the story does not end with the dismissal of CV 84–P–0955–S, because OSM had already purported to impose the maximum civil penalty of $22,-500.00 on Camp Coal under the provisions of 30 U.S.C. § 1201 *et seq.*, as punishment for Camp Coal's alleged violation. After this initial assessment, Roger Wiedeberg, the OSM inspector who conducted the assessment hearing but who had never seen the minesite, told Camp Coal that he would set up a conference between Camp Coal and the inspectors who had actually viewed the site, but Wiedeberg never talked to McPheeters and never set up such a meeting, probably because the meeting would have been too expensive. Instead, Wiedeberg advised Camp Coal that although an appeal from the assessment to an administrative law judge (ALJ) would ordinarily require the advance payment or escrowing of the $22,500 as a prerequisite, since Camp Coal did not have the money it should attempt to appeal without such prepayment. In fact, Wiedeberg told Camp Coal, and testified, that appeals for assessments had been accepted without pre-payment despite regulations to the contrary. The United States offered no testimony whatsoever to refute this testimony, leaving the court to conclude that Wiedeberg was correct. On March 14, 1984, through Wiedeberg, OSM wrote Camp Coal, saying *inter alia*:

> If you wish a formal hearing to contest the revised or affirmed assessment(s), you must submit a petition for review within 15 days after the date after you receive this letter to:
>
> Office of Hearings and Appeals
> Hearings Division
> U.S. Department of Interior
> 4015 Wilson Boulevard
> Arlington, Virginia 22203

> In your petition you may include a request for a formal hearing on the fact of the violation if you have not previously been granted or denied such a hearing. Your petition must be accompanied by a check or money order payable to "Assessment Office—OSM" in an amount equal to the total of the revised or affirmed assessment(s) for which you are requesting a hearing. If you fail to submit the check or money order with your petition, or if the check is returned for non-payment, or if the check or money order is written for an amount less than the proposed assessment(s), *you may forfeit your right to a hearing.* (emphasis supplied).

Consistent with Weideberg's oral suggestion that an appeal might be taken without prepayment, the words of this notice were conspicuously *not*, "you *will* forfeit your right to a hearing", but rather, "you *may* forfeit your right to a hearing."

On March 21, 1984, within the 15 day period stated in Weideberg's notice of March 14, 1984, Camp Coal filed an appeal to an ALJ without prepayment. OSM moved to dismiss the appeal. The appeal was dismissed by the ALJ as "untimely". The ALJ made no mention whatsoever of Camp Coal's failure to accompany its appeal with $22,500.00. If that fact was the basis of the finding that the appeal was "untimely" it nowhere was articulated. This court finds it peculiar that an appeal which was totally ineffectual could be "untimely". If OSM's position before the ALJ, and before this court, is correct, namely that an appeal is ineffectual without the assessment being prepaid, then there was no appeal, "timely" or "untimely".

After the dismissal of Camp Coal's attempted appeal from the assessment, the United States then filed this action to enforce OSM's assessment of $22,500.

CONCLUSIONS OF LAW

■ This court has jurisdiction over the controversy between the parties pursuant to 30 U.S.C. § 1268(d), and 28 U.S.C. §§ 1345 and 1355.

Both in its motion for summary judgment and at trial the United States takes the position that this case is very simple, its theory being that Camp Coal, by not having properly invoked and exhausted its administrative remedies, allowed to be set in concrete the penalty of $22,500.00, rendering moot the propriety *vel non* of the assessment itself which cannot be judicially examined in this proceeding. The court finds no binding precedents on the issues here raised by the parties. Neither the Fifth Circuit, the Eleventh Circuit nor the Supreme Court has expressed itself on the subject. The United States cites three cases for its proposition that under 30 U.S.C. § 1268(c) a mine operator's failure to exhaust its administrative remedies results in a waiver of any right to contest either the violation or the assessment of the penalty: *Blackhawk Mining Co. v. Andrus*, 711 F.2d 753 (6th Cir.1983); *B & M Coal Corp. v. Office of Surface Mining Reclamation and Enforcement*, 699 F.2d 381 (7th Cir.1983); and *Graham v. Office of Surface Mining Reclamation and Enforcement*, 722 F.2d 1106 (3rd Cir.1983). It is true that these cases, especially *Blackhawk*, stand for the proposition for which they are cited. However, they deal with the question of waiver by the mine operator and not waiver by the OSM. This court believes that OSM here effectively waived in favor of Camp Coal the requirement for prepaying the assessment as a prerequisite to its appeal, and that the ALJ's dismissal of the appeal as "untimely" was erroneous. A very recent expression on this subject by the Eleventh Circuit appears in *Amcor, Inc. v. Brock*, 780 F.2d 897, (11th Cir.1986), decided on January 21, 1986. In the opinion at p. 899 the Eleventh Circuit says:

The threshold issue is whether the administrator was foreclosed from reviewing the ALJ's findings because the solicitor had failed to file timely objections. The regulations required the solicitor to file exceptions by February 15, 1979. We conclude that we need not decide the meaning of the word "filed" in the regulations since *the administrator was entitled to waive the filing deadline in the*

*interest of justice. An administrative agency may waive procedural requirements in the interest of justice,* provided such a waiver will not prejudice the other party. (citing cases). (emphasis supplied, except that the word "procedural" was italicized by the Court.)

The totality of circumstances in the instant case constituted a waiver by OSM of the *procedural* requirement of prepaying $22,500.00. The interest of justice was served by the waiver, that is, until the appeal was erroneously dismissed.

■ If the court is for some reason misreading *Amcor* and is incorrect in finding a waiver by the OSM, then the court respectfully disagrees with the conclusion reached by the Sixth Circuit in *Blackhawk* that prepayment of the assessment as a prerequisite to an appeal to an ALJ does not constitute a violation of procedural due process. As stated by the Sixth Circuit, a fundamental requirement of procedural due process is the opportunity to be heard "at a meaningful time and in a meaningful manner". *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). If the parties will pardon a reference to current events, the court analogizes Camp Coal's situation to that of Texaco in its defense of the Pennzoil judgment. If this court correctly understands the newspaper accounts of *Pennzoil v. Texaco*, there is a question as to whether or not Texaco can appeal from a multi-billion dollar judgment without putting up a supersedeas bond in the full amount of that judgment, and that a non-Texas judge has recently found such a requirement to be a denial of procedural due process. Camp Coal, in fact, may have had a more difficult time coming up with $22,500.00 on March 21, 1984, than Texaco now has in coming up with $10,000,000,000. It is probably for this reason that Weideberg willingly waived the prepayment requirement "in the interest of justice", even though he did not hold himself out to be a constitutional lawyer.

This court finds persuasive the decision of the United States District Court for the

Western District of Virginia entered on June 20, 1985, in *Clinchfield Coal Co. v. Hodel*, —— F.Supp. —— CV 85–0113–A, in which Judge Kiser says, *inter alia*:

The underlying questions in this case are the scope of authority given to a state which has achieved primacy under the Surface Mining Act, and what reliance, if any, permittees can place on the decisions of the appropriate state regulatory body. The Commonwealth of Virginia submitted a state program to the Secretary of Interior which was designed to be "consistent with" the Act and the regulations of the Secretary. The Secretary has defined the term "consistent with" as follows:

(a) With regard to the Act, the state laws and regulations are no less stringent than, meet the minimum requirements of and include all applicable provisions of the Act.

(b) With regard to the Secretary's regulations, the state laws and regulations are no less effective than the Secretary's regulations in meeting the requirements of the Act.

30 C.F.R. § 730.5.

Where there are differing interpretations on the meaning of the federal or state regulations, can the state make an interpretation, or is OSM's interpretation the binding one?

\* \* \* \* \* \*

The sole basis for the issuance of this Notice of Violation is that OSM disagrees with Virginia's interpretation of Virginia regulations. OSM feels that the specific requirements for durable rock fills should take precedence over any variance procedure that may be allowed under the Virginia regulations. OSM claims that its interpretation of the intent of federal regulations and its oversight authority give it the power to issue this N.O.V.

\* \* \* \* \* \*

This issue obviously is quite complex and must be more fully explored on the merits of the case. My review of the statute and limited portions of the legislative history confirms my initial impressions of this case. If the term "primacy" is to have any meaning, then the state regulatory authority must have principal responsibility for interpreting and enforcing its own regulations and the Surface Mining Act. If the state fails to enforce the Act, then OSM may take action to withdraw approval of the state program under 30 U.S.C. § 1271(b). I do not believe that Congress intended the OSM to serve as a duplicative regulatory body, conducting inspections and directly issuing notices of violation, especially where the state authority has made a determination that no violation exists.

Perhaps the reason this court finds Judge Kiser's opinion persuasive is that this court reached similar conclusions in *Drummond Coal Company v. Hodel*, —— F.Supp. —— CV 85–AR–1411–S on June 5, 1985, 15 days before Judge Kiser's opinion was handed down. The Secretary did not appeal from the *Drummond* decree. Theoretically, this court should be no more persuaded by what itself has previously opined than by what any other court has said, that is, except what the old Fifth Circuit, the Eleventh Circuit or the Supreme Court has said. Nevertheless, the predominant issue in both *Clinchfield* and in *Drummond* is the extent to which OSM has the right to force its view of reclamation requirements over a conflicting view by the state regulatory agency, particularly where the state agency's view makes good sense.

In the instant case, the United States wants to hide the clear fact that the underlying issue is one of a direct conflict and confrontation between OSM and ASMC. The truth is that Camp Coal is no more than a pawn or victim of this confrontation.

If the notice of violation issued in this case overstepped OSM's authority and was void, did it suddenly become valid and enforceable as a basis for an assessment just because the operator lacked the wherewithal to meet a monetary administrative appeal prerequisite? The court thinks not, even without a waiver of the prerequisite by OSM.

342

The court finds several fatal defects in the notice of violation and in the cessation order itself. First, under the rationale of *Clinchfield* and *Drummond* the primacy of ASMC prevented OSM from issuing the notice of violation and the cessation order. Secondly, the Department of Interior's own regulations were violated by it in its dealings with Camp Coal. The pertinent words are found in that portion of the Code of Federal Regulations offered into evidence by Camp Coal as its Exhibit 2, without objection by the United States, as follows:

> Accordingly, these final rules provide that the Office will not assess the daily penalty for failure-to-abate during the period from the abatement date set in the notice of violation or cessation order to the date of the OSM inspection [30 C.F.R. 723.15(b)]. Thus, penalties will begin to accumulate on the date that the Office actually reinspects the minesite and determines that the violation cited in the notice of violation or cessation order has not been abated. Such reinspections will normally occur on the date set for abatement unless something unexpected occurs such as an equipment failure, inclement weather, etc.
>
> The Office recognizes that there is a potential for abuse of this modification, and that if the reinspection does not occur on the abatement date, it may be a *de facto* extension of time to abate. However, the Office is coupling this modification with a policy that the Office reinspect on the date set for abatement or within 3 days thereafter.

This language can only mean that OSM's inspection should have taken place on or before October 9, 1983, inasmuch as October 6, 1983, was the abatement date. When OSM did not conduct the inspection timely, a *de facto* extension automatically resulted by OSM's own rules. Thus, even if the conflict between ASMC and OSM were resolved in favor of OSM, OSM trespassed its own rules and put egg on its face. Thirdly, Dykes' conclusion reached on December 16, 1983, leading to the assessment, while correct in finding as a fact

"that the violation *reappeared* prior to the follow-up inspection", was incorrect in the conclusion of law that the fact that Camp Coal "failed to notify OSM upon the abatement" meant that the violation must be considered as "continuing". The United States has offered no authority for this strange proposition of law, and the court finds it to have been erroneous when stated and erroneous now. The fact is that if the abatement was completed prior to October 6, 1983, as the court has already found to be a fact, and as Dykes inadvertently admitted, then any new "rills and gullies" thereafter appearing would constitute an entirely new violation which would trigger the requirement of an entirely new round of notices and orders, and which would have provided no basis whatsoever for an assessment under the earlier notice of violation and the earlier cessation order.

The question of whether or not OSM can bootstrap an unvalid cessation order into a basis for an assessment by virtue of the fact that Camp Coal could not pay the $22,500.00 has already been discussed, but it may deserve further comment. If OSM is correct, then any operator who cannot prepay the assessment can be forced to pay ultimately. The court can find no case dealing with the dischargeability of this kind of "penalty" in bankruptcy. The court has already used the *Pennzoil v. Texaco* analogy. A more appropriate analogy may be the criminal case analogy, because the assessment under the Surface Mining Act is a "penalty" rather than the collection of a "loss". Thus, under the criminal case analogy, a convicted defendant, if he cannot appeal from the imposition of a fine without first paying the fine would be in an untenable position. If such a precondition to appealing from a fine meets the constitutional requirements of "due process", then OSM is entirely correct. OSM has made no effort to disprove the fact that Camp Coal lacked the wherewithal to pay the $22,500.00. If there had been proof offered that Camp Coal, in fact, had $22,500.00 on March 21, 1983, the constitutional issue might be different. As it

is, the court finds it difficult to find that Camp Coal was afforded due process, that is, unless it was inadvertently afforded by Weideberg's waiver.

If Congress had not anticipated the possibility that an allegedly offending coal operator could have an opportunity to attack the cessation order itself in defense of an assessment collection suit, why did Congress require OSM to file an assessment suit in order to collect? The Internal Revenue Service, for instance, has its own collection mechanisms. It does not need to file a collection suit. If Congress had intended to preclude the operator from interposing the defense here set up by Camp Coal, then the better legislative remedy for the OSM would have been a summary collection proceeding without resort to the federal courts.

Because the court concludes that the notice of violation and the cessation order were void *ab initio,* and because the court further concludes that Camp Coal was and is not barred by its own impecuniousness from interposing such defense, the court will enter a separate judgment in favor of Camp Coal.

As to Camp Coal's counterclaim and motion under Rule 41(b), the court finds them academic.